Good morning, your honors. Donald Cook for plaintiffs and appellants. What's not an issue in this case is the right of the LAPD personnel to detain Ms. Beed and Ms. Reynolds at the location. Clearly, they have sufficient cause given the nature of the execution. There is also no dispute about the LAPD's right to initially take Ms. Beed into custody based on the felony warrant that they transferred her to Southwest Station. What is in dispute with respect to Ms. Reynolds, excuse me, with Ms. Beed is the decision made about six hours, seven hours later to book her on that felony warrant after they had generated the information, the official documentation, which had Detective Sapper read it, exonerated her as not being the subject of this warrant. Counsel, it seems to me, as you look at the cases in the immunity statutes, that the whole thing gets down to the reasonableness of the conduct. Do you agree with that? Well, with respect to the state law immunities, sure, absolutely, which is why it was error to rely on those immunities and throwing out the claims against both the county and the city. So your point, I gather, is that given what the county knew, what the city knew, at least with respect to Ms. Beed, that it was not reasonable in light of the information she presented to continue and, therefore, this needs to go to trial. With respect to Ms. Beed, I just quibble with the information she provided. Because to trial, I'm bound by the facts. Right. But the official documentation established she was not the person. Detective Sapper's defense was, well, I basically didn't really read the paperwork that carefully. I didn't notice the fact that the fingerprint-matched identifiers didn't match, that she had been cleared. And I submit under a Fourth Amendment objective reasonable standard, it's objectively reasonable to expect police officers to read official documentation. I'd like to make sure I know just exactly which documents you're referring to. So are we talking about the warrant information sheet? Well, the warrant is one such document. That would be Trial Exhibit 100. It's that 64C of the excerpt of record. Okay. The other document would be the, it's called Tears Report, Exhibit 103. It's at, begins at excerpt of record 64G. This is the document that's received at about 312 a.m. August 5th, about an hour before Ms. Beed is booked. This is the document that the other people at the trial look at. I mean, I'm talking about Detective Richard Hooper and others. He looked at it and he said, yeah, she's not the subject of this warrant, notwithstanding the matching name and matching identifier, because of the fingerprint identifier. Okay. Just slow down just a minute, counsel, so I can make sure I've got this right. So on that document, on 64G, the one that has her photograph on it. Correct. Okay. What we're looking, what you're interested in looking at is under the summary where it says warrants, and we have the three zeros, the column with the three zeros. Is that what should have alerted? That's one factor, yes. Okay. What else should have alerted the police here? Right at the top, CII number and main number, but particularly CII number, the state identification, match to fingerprints. It didn't, did not match the CII number for the subject of the felony warrant. If you look at Exhibit 100, the warrant information sheet, the numbers don't match, which to police officers, again, warrant information sheet. Is that something that the police officers have a duty to check every time? Oh, absolutely. Anything that establishes that? Is that part of their training? Absolutely. CII number was created by law enforcement to deal with the problem of people with similar, same names, identity theft and the like. It's matched to fingerprints. It is the shorthand, most reliable method, short of doing an actual visual comparison of fingerprints, to tell you, to tell the officer, to tell people in law enforcement, this person's fingerprints don't match the others. Do they have a duty to check that even without Ms. Bede's sister coming back in with the judicial clearance form and waving this at the officers? Again, I'm accepting the facts in favor of the defendants. The officers discount the judicial clearance form because they said it was altered or whatnot. I would submit, independent of anything that Ms. Reynolds did to alert the police officers, when it comes to something like fingerprints, yes, they're under a duty to look at it and to compare. Fingerprints are dispositive in ruling someone in, ruling someone out. I mean, there was some pretty striking parallels here that suggest they had the right person. I mean, we had a driver's license number. We had the age, the race, birthdate, height, weight. That's why I say at the very beginning of this argument, there's no dispute that they had a right to detain Ms. Reynolds, excuse me, Ms. Bede, because at the house, you know, they had her driver's license, they ran her name through the system, and a warrant match came up. Right? Name, non-unique descriptors, driver's license, all matching. Fine. Then they take her to Southwest Station, and then they identify her based on her fingerprints. That's when they generate the Cheers report, also the warrant information sheet, which gives them more detailed information, and then you're supposed to match person to paper. And that's when it falls down. On the Cheers report, last page, it states she'd been exonerated back in September of 2001, four years earlier, as being the wrong defendant on the warrant. This is why Detective Richard Hooper came in and testified. He looked at these documents. He said, sure, there's matching information, but no, no, no, no. The CIA numbers don't match. She has no outstanding warrants according to the Cheers report, which is based on fingerprints. That's why Sergeant Summers of the Sheriff's Department said the same thing. So the point here is not all information is equal. Everyone knows the problem with names and such not being unique. This is why they have CIA numbers. And for the police to say we can disregard CIA numbers because, as Detective Zapper said here, gosh, it was early in the morning and lots of other things matched, sends the wrong message. When you have an identifier like fingerprint-matched identifiers, you're under a duty to, and you have it in front of you, to look at it, to read it, to compare it. That's objectively reasonable. So by the time 3.12 a.m., August 5, 2005, when they had the documentation showing, hey, it turns out she's not the subject of this warrant, and that was the only basis for taking Ms. Bead into custody, right, they had to cut her loose. They didn't. That's why Detective Zapper is liable as a matter of law under 1983. It's also why the city would be held liable on the state law false arrest claim. I want to compare a couple of statutes here, get your read on these. Civil Code 4355A speaks of there being no liability on the part of an arresting officer if the officer acts without malice under the reasonable belief that the person arrested is the one referred to in the warrant. And you agreed that under these facts, that was correct, right? And so at that point, at the point of arrest. At the point of the arrest, at the station, excuse me, at the house, yes, I agree. And that's my point. Okay, so now we go to Penal Code 847B, which says there's no liability caused of action against a peace officer, in quotes, acting within the scope of his or her authority for false arrest or false imprisonment arising out of any arrest. Now, the arrest is the one back at the house where the arrest was lawful or the peace officer at the time of the arrest had reasonable cause to believe the arrest was lawful. So it seems like that the statute, in this case, Penal Code 847B, refers back to the original arrest so that you've agreed that at the house, it all seemed to match there because it didn't have the other information. The false arrest count seems to tie back to the arrest at the house and whether that was reasonable, not what happened at the time they were in the station house or in the jail. Do you disagree with that interpretation? I disagree with it for these reasons. Okay. The decision is made at the station to booker on the warrant. This is by now a collective decision. It's not just Detective Sapper. It's been reviewed by other personnel with the LAPD, and essentially there's a collective decision. Yes, let's booker on this warrant. Okay. I understand your logic on that, counsel. What I'm wrestling with is it seems to me that 847B gives immunity from liability to the officers at the station house in this case for false arrest if the original arrest was done properly and if they reasonably believed that that had happened. I know you're disputing that construction, but I'm struggling with it because I understand your point that once they got to the station house and they got a whole new set of facts involved, but the immunity statute doesn't seem to deal with that. Am I missing something? I certainly hope so. The immunity statute, 4355, 847, is based upon there's immunity for the set of facts the officers have at the house. Right. When the facts change, application of the immunity also must change. Where does it say that in the statute? That's what I'm looking for. The statute said that, a little caveat in there, if things change at the station house, all bets are off or something to that effect. I would follow you on that, but this doesn't seem to say that. It seems to say that if the officers that handle the person that's been arrested and processing everything there have a reasonable belief that the person was arrested properly before, they are immune. That's what it seems to say on its face. Is there any California case law, any Federal case law construing 847B that would basically buttress your claim that we should create a new scenario? Well, I don't know of a specific case dealing with the factual scenario you posit here. I would submit, though, that it could lead and would lead to absurd results. For example, the officer at the scene makes a reasonable decision to arrest someone under warrant, turns the arrestee over to someone at the station, someone at the station has a wealth of additional new information that says, wait a minute, this is the wrong person, no offense to the officer who made the arrest. Under the logic of, as I hear Your Honor read in the statute, that second officer, despite actual knowledge he's not the person, could claim immunity. I'll stipulate it may be absurd. Many statutes have that distinction. My point is simply, if you have an absurd statute, at least as applied to the facts, are we not anyway, so far as the immunity of public officers required to follow that statute? No. And the California case is Sullivan v. County of Los Angeles. There, Mr. Sullivan, a client, a late colleague of mine, Hugh Manis, was held lawfully in the county jail. And then what happens is, between his sentence expiring and someone overlooking the fact that other charges have been dismissed, he's held over. Nevertheless, the county was held liable both under direct liability under statute as well as vicarious liability for the failure of the sheriff to release the person. But you're talking about a different, I guess what I'm trying to distinguish is this statute, 847B, and the circumstance that you described. I don't know how we get around this statute. I understand your point. I understand that it seems absurd that if you have the factual situation that you posit that you don't have a new clock ticking, if you will. But the statute doesn't say that, does it? The statute doesn't say that in so many words, but it says that the officer acted reasonably. And when you're looking at, remember, there's a state law claim against the city. The city can held liable under 815.2 for acts of even unknown employees of the city. Other personnel at the LAPD at the station knew or should have known she was not the person. They can be charged independent of anything that Detective Sapper failed to do. I know I'm running really short. Unless there's a question, I just want to mention very briefly, with respect to Ms. Reynolds' claim, the strip search is unlawful as a matter of law. The only basis, per the officer's testimony, to take her to Southwest Station to verify identity. They had ruled her out as being involved in the narcotics transaction. That right there establishes that they did not have a basis for strip searching, as they implicitly admitted. And, of course, the jury found that she had been strip searched. If I can save my 15 seconds, plus another minute or so for rebuttal. All right. Thank you. Good morning, Your Honors. Amy Field on behalf of Detectives Sapper and Garcia in the City of Los Angeles. I'd like to start, I guess, with the issue of booking Ms. Bead on the warrant. I don't think anything changed at the station that converted this otherwise lawful arrest on the warrant into something unlawful. The facts remain the same. I think that counsel is attributing far too much weight to the differing CII numbers. And I think this is a he's asking that an inference be made that because there were different CII numbers, there were different fingerprints, and that Ms. Bead was, per se, the wrong person on the warrant. But isn't that a reasonable inference? If you've got two different CII numbers, that they're not the same fingerprint? I think it could be a reasonable inference, but I think the jury found otherwise, and I think there was substantial evidence to support the jury's finding. All of the experts conceded that looking at this massive documentation revolving around the warrant and Ms. Bead's criminal history, that there were some ambiguities in there. There was testimony that the booking number is also fingerprint-based, and the same booking number appeared on Ms. Bead's rap sheet and on the warrant, suggesting that these were the same person, that the warrant was, in fact, for Ms. Bead. Those were fingerprint-based numbers as well. I believe that one of the experts testified that in his experience, he has seen situations where two different CII numbers are attached to the same person because mistakes happen in the system. And I think here, in the face of the overwhelming evidence that this was, in fact, Ms. Bead's warrant, it was wholly reasonable for the officers to go ahead and book her on this warrant. I think under the Supreme Court case of Baker v. McCullen, law enforcement is allowed a reasonable time to sort out when there are maybe some ambiguities in the documentation. And she was released within a reasonable time once those ambiguities were sorted out. I think short of actually rolling her fingerprints and pulling the fingerprints that were rolled on the person who was arrested on the warrant, you can't know for certain. So, counsel, your – I want to make sure I understand your argument. Your argument is that there's no constitutional violation, so there's nothing to which to apply the immunity provisions of the California Code. Is that correct? I think so, yeah. There is – my argument is definitely there's no constitutional violation. The other thing I'm wondering is, if you look at the other articles, the colloquy that Judge Smith had with Mr. Cook on 847, you wouldn't even – you don't even think you have to reach that. It was a different way of looking at it, and I was sitting there looking at it, thinking, gosh, maybe I should have approached it that way as well. But I think that both the immunity statutes under State law and the Fourth Amendment both apply a reasonableness standard, and I think this reasonableness standard was more than met here. Let's suppose that we disagreed with you on the constitutional question, and wouldn't that force you to go to the 847 question? I think the 847 question would definitely cover the State law claims. Okay. Well, let's go back to Judge Smith's hypothetic, which I thought was a good one. What happens under this statute, the arrest has to be lawful at the time of the arrest. Does that cover the officers for as long as they want to keep Ms. Mead in jail? They get to keep her indefinitely, even when they know that she's not the right person? No, I don't think so. Okay. So how do we read this statute then? I think the statute covers the arrest, and if there's conclusive evidence that she's the wrong person, then obviously I think they have to release her within a reasonable time. But the evidence must be conclusive. Yes. And here it was not. Far from it. So you agree with opposing counsel's absurd result construction of the 847B statute? Yeah. I'm in the odd position of having to agree with counsel. But, yes, I think if you have conclusive evidence that you've got the wrong person in custody, even if you thought they were the right person at the time of the arrest, you can't hold them indefinitely. I mean, I think that's obvious. So the statute just really doesn't answer that question. Doesn't answer the question. It doesn't apply or it's unconstitutional. Maybe you don't have a state law false arrest claim, but I don't think that that would preclude a 1983 Fourth Amendment claim. But you would adopt a very, very high level of surety that the police have to have in order to sort of contradict the information they had at the time they made the arrest. Yes, I would. And I think that's consistent with Federal case law, too. I think what counsel's trying to do is bring his case within, I think it was the Connell case that was cited in both of our briefs, where, you know, at the time of the arrest, sure appeared to be the person that was named in the warrant, but then they take the person to the station, she's protesting her innocence. They actually run the fingerprints and have a fingerprint analyst do a comparison and that person says, you've got the wrong person, you've got to let her go, and they just, law enforcement just ignores it. We don't have that here. We don't have that here. All we have are the two differing CII numbers measured against a mountain of evidence suggesting she is the person. But you also have the, maybe I'm mistaking which one we're involved with. Didn't the sister bring in the judicial clearance form? I may be using the wrong term, but didn't she bring in a judicial clearance form, hard to read, admittedly, about this same person? She claims she did. She claims she brought in a legible copy. She claims, Ms. Bede claims that she was repeatedly protesting her innocence. The jury implicitly rejected that testimony. So from your perspective at this point, as far as the facts are concerned, unless we find that there's clear, there's just a complete absence of evidence to back up what the jury said, we're bound by the jury's factual findings. That's absolutely correct, Your Honor. And if we're through with the portion dealing with Ms. Bede, I'd like to go on to Ms. Reynolds and her strip search. I think under the Supreme Court case of Devenpeck v. Allford, it is irrelevant what the officers subjectively intended to bring Ms. Reynolds to the station for. You have to look at the objective facts. And once again, the objective evidence was overwhelming that there was cause for the officers to reasonably suspect that Ms. Reynolds was hiding contraband on her body. This woman was arrested in a drug house, found barricaded in a bathroom where drugs had been openly being sold for hours, days, I think. So I think there was ample evidence to support a reasonable suspicion. And in which case are you relying upon from the Supreme Court? Devenpeck v. Allford, which says that the officers' subjective reason for the arrest is irrelevant. It turns on the objective facts. And I would like to reserve a few minutes for county counsel, or counsel for the county of L.A. Okay. Thank you, Ms. Field. Mr. Caron. Good morning, Your Honor. Scott Caron for the county. The only issue with respect to the county is the dismissal at the pleading stage of the state law claims against the county pursuant to the statutory immunities that we've been talking about. The most relevant case, I believe, is Lopez v. City of Oxnard, which is a case that held that law enforcement personnel are immune from suit pursuant to these statutes. And it's not just 43.55 and 847, but also Code of Civil Procedures Section 262.1, not just for the initial arrest, but also throughout the process, the subsequent detention by the arresting agency and subsequent custodial. At what point are your officers going to lose their immunity? At what point does it become unreasonable? We questioned Mr. Cook, and we pushed on Ms. Field until we got Ms. Field to tell us that at some point she becomes pretty uncomfortable asserting an 847 immunity. Have you got the same limits? I think actual knowledge would be the point at which officers lose the immunity. In other words, as long as there's a reasonable belief. Look at the Lopez case. The guy, he complained repeatedly to the officers that he wasn't the person. He presented a judicial clearance form to the officers. It had happened before. He had actually been arrested by the same arresting agency in the past. He actually had non-matching CCI numbers and Andy Beat's cheers report, and had a cheers report, right? I'm sorry. That's not correct in this case. I'm mistaken about that. What I was thinking of is in Lopez, the court said the result might have been different if the officers had been provided with, in quote, sufficient notice from an official source. Right. At least limited it in that sense. Right. And that's, I think, what I mean when I say actual knowledge is the standard. That's where law enforcement loses the immunity. If you look at, I just want to talk a little bit about the facts that were before the district court on the county's motion for judgment on the pleadings. And these are facts that are not only alleged in the complaint, but also facts that were judicially noticeable. The county, the information that the county had was they had the warrant. The warrant listed the plaintiff's name, date of birth, same race, same gender, same height. I think there was a five-pound difference in weight. That was it. There was no evidence, no indication, no allegation that the county knew that there was a different CAI number or that the county had access to the judicial clearance form. So there was really nothing for the county, no reason at all for the county not to think that she was the subject of the warrant. Just to finish up from your perspective, 847B, you agree with your co-counsel that there must be some limit on that statute. It doesn't just relate back to the time of the arrest, even though it seems to say that on its face? Yeah. And, again, I think it's actual knowledge. And I'm basing this on – What constitutes actual knowledge? Well, actual knowledge, some – There was actual knowledge in this case that the CCII numbers didn't match. Right. Well, but, again, CII numbers are just numeric identifiers. That doesn't constitute conclusive proof. If, for example, the arresting agency or the county had the fingerprints, the actual print fingerprints, hard copy of the warrant suspect, they could do a manual fingerprint comparison, and at that point they would know that the fingerprints don't match, and that might constitute actual knowledge. And I've seen Federal cases that indicate that a manual fingerprint match or mismatch constitutes actual knowledge. There's nothing like that in this case. And from your perspective, the only thing was that fingerprint issue, right? The CCII number. Other than that, there was nothing. You don't believe that the sisters allegedly bringing in the judicial clearance form, in quotes, had any bearing on it? She – I believe, if I'm correct on the facts, the sister brought the judicial clearance form to the city, not to the county. Okay. So, in fact, if you look at the evidence that was presented in our motion for summary judgment, the evidence was that the judicial – if the judicial clearance form was – That's not even part of your situation at all. I just want to point out that later on that was the evidence that was presented. A lot of folks involved in this one. In a sealed property bag, and that they would not have had access to it. So there was – there were no facts alleged or offered to be alleged that could indicate actual knowledge. And so I think that the dismissal was correct. Okay. Thank you. Okay. This was a little unusual when you're sharing time. We do have two minutes and 48 – 47, 46 seconds. Ms. Field, is there anything that you wanted to add here that's come up? We do have combined time for the city. You were gracious enough to cede time to Mr. Caron. He hasn't used all of his time. I will allow the joint parties to use the time if you want it. If you don't want it, you can give it back. You don't have to. I'll take it. I guess I would just like to reemphasize that these differing CII numbers, first of all, Detective Sapper said that she didn't even notice the differing CII numbers. She also said that had she noticed that, so she didn't have actual knowledge of those, but she also said had she noticed it, it wouldn't have changed her analysis. It would have been maybe a flag that something was amiss, but she would have, again, had to have looked at all the other overwhelming evidence pointing to the fact that she had the right person in custody. And, again, I'd like to emphasize that she and the experts talked about the fact that the booking number attached to this warrant appeared on Ms. Bede's rap sheet and on her – and on the warrant, and she knew those were fingerprint-based and so that to her suggested it was one and the same person. If she had seen the CII numbers, what else should she have done? What does the city have to do when they've got – when all of a sudden they realize that they've got some kind of a conflict? Either somebody has double-entered these fingerprints and assigned them two different CII numbers, or we've got two different CII numbers because we have two different sets of prints. Now, had she noticed that, what should she have done? I think under the Supreme Court case of Baker v. McCollin, the city has a reasonable time to sort that out. And I think the only way you can sort that out is to pull the hard copy of the fingerprints that are attached to that warrant and compare them to the fingerprints of the person you have in custody. And that takes time. And that's why Baker v. McCollin says you get to hold them for a reasonable amount of time until you can sort this out. You certainly don't boot them out at 4 in the morning just because the CII numbers are different. Does the city train its officers to check those CII numbers? I can't answer that. I would assume they do. So perhaps she should have checked the CII numbers. Perhaps. I mean, it probably doesn't happen very often that you end up with this kind of mistaken identity. But it does happen every once in a while, and it does look like – I mean, in retrospect, we can see for ourselves that you've got two different CII numbers on these forms. Well, and again, I think that, you know, just the task at hand requires time. It's not going to happen in the middle of the night. Shouldn't you have been put on notice, though, when somebody came in with a judicial clearance form? Even if you couldn't read it very well, and even if the sister and the arrestee were fairly inarticulate, shouldn't the waiving of the form have said something to them? Well, I think the detective's response to that is people are always claiming it's not me, it's not me. And here you have something where there's no signature on it. I think one of the copies didn't even have a court seal on it. It wasn't dated. And, again, it still had that kind of confusing booking number. So, yeah, maybe you do follow up on it, but it's not going to require the officer to immediately release someone in the middle of the night, and that's what plaintiff was asking for here. Maybe you take them to court and you allow the court to give the plaintiff the process due, or in this case the criminal defendant the process due, and you sort it out in court, which is typically what happens, and which is what happened in this case. And you get some time to do that. Thank you. Thank you, Ms. Hill. Mr. Cook, I'll give you a minute to respond. Yes. Thank you, Your Honor. In fact, they had conclusive evidence. This effort to denigrate CII numbers, every lawyer in here has a CII number. I don't know if Your Honors are members of the California Bar, but if you are, you have CII numbers too. It is fingerprint matched. It is for the purpose of separating one person from another. That's why law enforcement creates it. That's why it's used. Ms. Field says that from time to time we do end up with duplicate fingerprints with different CII numbers. Mistakes happen. You do a manual fingerprint comparison. The fact that there are two different CII numbers wouldn't be conclusive from the city's perspective or the county's perspective that it might be important evidence that it's worth further investigation, but in and of itself wouldn't be conclusive. It is about as conclusive as you get in this planet where humans make mistakes, whether it's a manual fingerprint comparison, whether it's creating a CII number. It is about as conclusive as it gets. In the defense in this case. Yeah, but the CII number is not the fingerprint itself. No, it's matched to a set of fingerprints. It does not change, unlike booking numbers which are recycled through and are used only for that purpose. Is the CII number a descriptive number or is it just a random number like a Social Security number? It is a random number preceded by an A and followed by an H. It doesn't tell us whether we've got a whorl or whether the line on our fingerprints is broken or it doesn't tell us what we're looking for, does it? It just tells you the fact that because everyone in law enforcement knows this for a fact, that CII numbers are never supposed to be duplicated for another person, although mistakes happen. When that does happen, you know there's either something terribly wrong. You've got two different people. Law enforcement knows that. That's why the defense in this case wasn't that you can't believe in CII numbers. The defense was I didn't bother looking at it. That's why when Detective Richard Hooper from the L.A. I subpoenaed him, brought him in, he looked at it, didn't like having to say it, but he said, yeah, two different people. Cheers report, warrant information sheet. It was conclusive. With respect to Lopez, in that case, there was no official documentation telling the officers that in fact this person had previously been cleared. Yes, the arrestee had a docket sheet showing that I had been cleared, but, you know, that comes from him. In this case, they had conclusive official documentation. The Cheers report, wrong defendant, generated based on her fingerprints, put down an electronic plate, and this report comes out. This is what they had. They're under a duty, the LAPD is under a duty to read it and look at it and recognize. All information is not equal. When fingerprint-based matched identifiers don't match, that's telling you you've got a different person. For every identity thief, there's identity victim. This was the identity victim. Thank you. Thank you, Mr. Cook. We thank all counsel for the argument. Bede v. County of Los Angeles is submitted.
judges: Nelson T. G., Bybee, Smith M.